IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


KEVIN L. BOARDMAN,                                    CV 04-1509-MA

            Plaintiff,                          OPINION AND ORDER

      v.

JO ANNE B. BARNHART, Commissioner
of Social Security,


            Defendant.

        SHARON MAYNARD
        The Thomas Mann Building
        820 SW Second Ave., Suite 200
        Portland, OR  97204

            Attorney for Plaintiff

        KARIN J. IMMERGUT
        United States Attorney
        NEIL J. EVANS
        Assistant United States Attorney
        1000 S.W. Third Avenue, Suite 600
        Portland, OR  97204-2902


1 - OPINION AND ORDER

JOHANNA VANDERLEE
Special Assistant United States Attorney
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, WA  98104-7075

        Attorneys for Defendant

MARSH, Judge:

<u>**INTRODUCTION**</u>

    Plaintiff, Kevin L. Boardman (Boardman), brings this action for judicial review of a final decision of the Commissioner of Social Security denying his application for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act).  The court has jurisdiction under 42 U.S.C. § 405(g).

    Boardman alleged disability beginning August 31, 1999, based on low back pain, diabetes mellitus, adhesive capsulization, depression and allergies.  He was 45 years old when the Administrative Law Judge (ALJ) found him not disabled.  He has a bachelor's degree in history and a master's degree in special education.  In the past he worked as a companion, group home worker, group home operations manager, special education teacher, and commercial cleaning company operations manager.

    On appeal to this court, Boardman alleges the ALJ erred by: (1) improperly discrediting the opinion of Terry Davis, M.D.; and, (2) failing to provide legally sufficient reasons to discredit Boardman's subjective complaints.

For the reasons that follow the Commissioner's decision is affirmed and this case is dismissed.

## STANDARD OF REVIEW

The initial burden of proof rests on the claimant to establish disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995).  To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner bears the burden of developing the record.  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.  42 U.S.C. § 405(g); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id.

The court must weigh all the evidence, whether it supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, even if the evidence is susceptible to

more than one rational interpretation.  Andrews, 53 F.3d at 1039-40.  If the evidence supports the Commissioner's conclusion, the Commissioner must be affirmed; "the court may not substitute its judgment for that of the Commissioner."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001).

## DISABILITY ANALYSIS

The Commissioner has established a five-step sequential process for determining whether a person is disabled.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1520.  The claimant bears the burden of proof at steps one through four.  See Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  Each step is potentially dispositive.

Here, at step one, the ALJ found Boardman had not engaged in substantial gainful activity since his alleged disability onset date.  See 20 C.F.R. § 404.1520(b).

At step two the ALJ found Boardman had the following severe impairments: degenerative disc disease and a neck injury.  See 20 C.F.R. § 404.1520©).

At step three the ALJ determined that Boardman's impairments did not meet or equal the requirements of a listed impairment.  See 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).

The ALJ assessed Boardman with a residual functional capacity (RFC) to perform light work involving simple, routine,

repetitive work limited by the need to avoid hazards and public interaction.  <u>See</u> 20 C.F.R. §§ 404.1520(e), 404.1545.

At step four the ALJ found Boardman was no longer capable of performing his past relevant work.  <u>See</u> 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f).

At step five, however, the ALJ found Boardman remained capable of performing other work existing in significant numbers in the national economy such as file clerk, food assembler, and general office clerk.  See 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

<u>**DISCUSSION**</u>

**I.   <u>The ALJ provided legally sufficient reasons for discrediting Boardman's subjective complaints.</u>**

The ALJ found Boardman's subjective complaints to be less than fully credible for the following five reasons: (1) his activities of daily living were inconsistent with the degree of limitation he alleged; (2) the objective medical evidence did not support his limitations; (3) the record does not support Boardman's contention that he stopped working due to deteriorated work performance; (4) Boardman was paid for taking care of his mother-in-law after his alleged onset of disability; and, (5) Boardman's history evidences a lack of motivation to work. According to Boardman, these reasons are neither clear nor convincing.

The ALJ is not required to credit every allegation of disabling pain or else disability benefits would be available on demand.  See Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). However, once a claimant establishes the existence of an impairment and a causal relationship between the impairment and some level of symptoms, the ALJ must provide clear and convincing reasons, supported by substantial evidence, for rejecting the claimant's subjective claims.  Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595 (9th Cir. 1999); see also Thomas v. Barnhart, 278 F. 3d 947, 958-59 (9th Cir. 2002).

In assessing a claimant's credibility the ALJ may consider: (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for truthfulness, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the objective medical evidence; (5) the location, duration, frequency, and intensity of symptoms; (6) precipitating and aggravating factors; (7) the type, dosage, effectiveness, and side effects of any medication; and (8) treatment other than medication.  See Smolen v. Chater, 80 F.3d 1273, 1281-82 (9th Cir. 1996).

A.    Activities of Daily Living

According to Boardman, the ALJ failed to "identify what activities are inconsistent with [his] complaints and upon what evidence he relied" when he determined that Boardman's activities of daily living were inconsistent with the degree of disability he alleged.  I find no merit to this contention.

A disability claimant will not be penalized for attempting to maintain a sense of normalcy in his life.  However, when a claimant's level of activity is inconsistent with his claimed limitations, as here, his activities will have a bearing on his credibility.  See Reddick v. Chater, 157 F.3d 715 (9th Cir. 1998).

The ALJ reviewed Boardman's activities following his alleged onset of disability, which included: cleaning; shopping; cooking; taking public transportation; driving a car round-trip from Forest Grove, Oregon to Seattle, Washington every six weeks; paying bills; maintaining his residence; attending to his own personal care; caring for his mother-in-law after she had a stroke; doing some laundry; limited family activities; light grocery shopping; and, walking his dog about 2 miles per day and 5 miles on the weekend.  The ALJ determined that "[g]iven the degree of limitation alleged by the claimant, the undersigned would not expect the claimant to perform the above activities of daily living."  I find this conclusion to be reasonable in light

of Boardman's contention that he suffers from constant disabling back pain along with severe depression and anxiety.

The ALJ further found that Boardman's "statements concerning his impairment and the impact on his ability to work are credible but only to the extent that they are compatible with the residual functional capacity determination made in this case." Boardman claimed he could stand for 20 minutes at a time, walk for 2 hours, sit for 2 hours, and lift up to 30 pounds. The ALJ found Boardman retained the residual functional capacity for light work involving only simple, routine, repetitive tasks, no exposure to the public, and no exposure to hazards. Since light work involves lifting no more than 20 pounds at a time, a good deal of standing and walking or sitting with pushing and pulling, the ALJ implicitly rejected Boardman's contention that he could not stand for more than 20 minutes or sit for more than 2 hours. He also implicitly rejected Boardman's claim that he could not sustain work 5 days a week, 8 hours a day.

Boardman points to Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir., 2001) in support of his argument that the ALJ could not properly use his activity level against him without first finding that he was engaging in activity that was transferable to a work setting for a substantial part of his day. Vertigan does not stand for this proposition. Rather, referencing Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595 (9th Cir.,

1999), <u>Vertigan</u> states that if the ALJ were to find that a
claimant spends a substantial part of his day engaged in pursuits
involving transferable skills, the ALJ could discredit the
claimant's subjective complaints simply by so stating.  <u>See also</u>
<u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th Cir.1989).  However, even
if the claimants activities do not involve transferable skills,
the ALJ may still consider that his activities and activity level
are inconsistent with the degree of pain and disability he claims
to experience.  SSR 95-5p.

In sum, I find the ALJ's assessment that Boardman's
activities of daily living were inconsistent with the degree of
pain alleged is clear and convincing.

**B.    Objective Medical Evidence**

Boardman claims the ALJ could not discredit his pain
complaints solely based on a lack of substantiating medical
evidence, and in any event the evidence does support his claims.
Controlling case law clearly states that the ALJ may consider a
lack of supporting objective medical evidence as one factor in
evaluating a claimant's credibility.  <u>See</u> <u>Thomas v. Barnhart</u>, 278
F.3d 947, 958-59 (9th Cir. 2002).

In this case, after summarizing the record the ALJ
reasonably concluded that Boardman's subjective complaints were
"not supported by the objective medical evidence."  To the
contrary, the ALJ found Boardman was prescribed and received

conservative treatment for his chronic back pain, yet increasingly sought and received addictive narcotic pain medication without corresponding organic degeneration.

In December, 1998 Boardman had an MRI that showed only "mild post surgical changes at L5-S1 status post prior discectomy."  On January 2, 2000 Boardman presented to the emergency room complaining of low back pain and feeling depressed over the holidays.  He reported that he had been unemployed since August, 1999, and that he was considering returning to work part time. He denied an addiction to pain medication, but hospital staff refused to grant Boardman's request for narcotics because the pharmacy record showed he had been given 100 Hydrocodone on December 10, 1999 (just 22 days earlier) and should not have a refill for 28 days.  Hospital staff noted a "manipulative content" to Boardman's statements.

In January, 2001 Lauri Vessely, M.D., found Boardman to be "doing fairly well," noting that his activity level, which included walking 2 miles a day in the afternoon and 5 miles on Sundays, "doesn't change much from day to day."  On November 8, 2001, Boardman admitted to Dr. Davis that he had not been doing his physical therapy exercises and he requested more Darvocet for back and upper extremity pain.  A chart note from November 21, 2001, indicates Boardman obtained another prescription for pain medication on November 20, 2001 (12 days after the last one).  On

December 14, 2001 Boardman told Per Sweetman, M.D., that his depression medication was working well but his back pain was worse from taking care of his mother-in-law.

In February, 2002 Boardman wrote a letter to Dr. Davis requesting extra Darvocet for a two-week trip to Seattle to care for his mother-in-law.  However, Boardman later admitted he did not go out of town as he said he was going to, but said he needed the Darvocet because he slipped on the gravel while walking his dog.  Dr. Davis wrote the prescription.  In March, 2002 Boardman requested and received more Darvocet from Dr. Davis for a "flair of his chronic back pain."  That same month Dr. Davis stated that neither narcotics, physical therapy, nor a transcutaneous electrical nerve stimulation (TENS) unit improved Boardman's symptoms.  This was a curious statement in light of the amount of narcotics Dr. Davis prescribed, Boardman's admission that he had not complied with physical therapy recommendations, and his report to Suzanne Zarling, M.D., in July, 2002 that he had never tried a TENS unit.

In July, 2002 Dr. Zarling diagnosed Boardman with opioid dependence even though Boardman said he did not feel he was at risk of abusing his pain medication.  The ALJ noted that Boardman also told Dr. Zarling that for the past three years he had been unable to do any yard work, take car trips, or do housekeeping, which is in direct conflict with Boardman's record admissions.

On physical examination Dr. Zarling found Boardman walked somewhat stiffly, had a flattened lumbar lordosis, and reported a pulling sensation in his lower back when he bent forward. However, he could stand on his heels and toes and bend his knees. His lower extremity sensation, pulses, muscle bulk, and strength were all normal.  Dr. Zarling recommended that Boardman switch from Darvocet to methadone.

In September, 2002 state medical consultant Robert McDonald, D.O., reviewed Boardman's record and opined that he could perform light work limited by the need to avoid concentrated exposure to hazards.

In January, 2003 Boardman requested and received Vicodin from Dr. Davis after complaining that he hurt his ribs trying to climb into an attic.  In March, 2003 Boardman asked for more Darvocet for pain caused from pushing his mother-in-law's wheelchair.  In April, 2003 Robert Young, M.D., performed a right tibial motor nerve conduction study which indicated peripheral neuropathy in the legs with a moderate degree of dysfunction of motor nerve fibers and a moderate to severe degree of dysfunction of the sensory nerve fibers.  Notably, Boardman testified at the hearing that this condition did not affect his ability to walk. The same day of the nerve conduction study Boardman called Dr. Davis complaining of chest wall pain and asking for Darvocet even

though he was already taking methadone.  Dr. Davis again prescribed Darvocet.

In May, 2003, Boardman saw Kadavil Satyanarayan, M.D., about chest wall pain.  He stated that the pain is an eight on a scale of one to ten, ten being the worse pain ever experienced, and that it lasts for one to two weeks at a time and does not radiate.  On examination Dr. Satyanarayan found Boardman to be in no acute distress.  He was able to walk on his heels and toes and with a normal gait.  Boardman was able to alternate standing on his left and right leg and exhibit full trunk flexion, though his extension was "somewhat" limited.  Dr. Satyanarayan recommended that Boardman wear a rib belt and take pain medication when he is symptomatic.  He also showed Boardman how to do isometric strengthening exercises of his abdominal muscles.  Otherwise, Dr. Satyanarayan stated that there was no need for any other treatment.

In sum, I find the ALJ reasonably determined that the objective medical evidence did not substantiate Boardman's subjective complaints.

## C.   Inconsistent and Unverified Statements

The ALJ also considered the inconsistent statements Boardman made to Dr. Zarling in July, 2002, noted above, as evidencing a lack of candidness.  Boardman does not appear to contest this

reason for discrediting him, which I find to be clear and convincing.

**D.   Lack of Motivation to Work Full Time**

According to Boardman, caring for his mother-in-law after she had a stroke, and after his alleged onset of disability, was not inconsistent with his purported limitations.  The ALJ found that this activity showed Boardman was capable of working around the same time he claimed he quit work because of deteriorating work performance at his last job.  The ALJ reasoned that Boardman took up caring for his mother-in-law part time because he could do that and receive private disability payments from his previous employer.  The ALJ noted that Boardman applied for social security benefits around the time his private disability benefits were discontinued, and found that this correlation, together with his part-time work after his alleged onset date, evidenced a lack of motivation to work.  I find this to be a reasonable interpretation of the evidence.

In sum, I find the ALJ provided clear and convincing reasons for rejecting Boardman's testimony.

**II.  <u>The ALJ provided legally sufficient reasons for rejecting Dr. Davis' opinion.</u>**

Terry Davis, M.D., wrote two letters to Boardman's private disability carrier, included in the record, which Boardman claims the ALJ wrongly rejected.  The first is dated October 16, 2001,

and states that Boardman is on Fentanyl patches and also uses
Darvocet for "breakthrough pain." Dr. Davis stated that Boardman
has "chronic benign pain...that is not due to a malignancy" and
that he doubted if Boardman would "ever be able to return to
work." Dr. Davis further wrote, "I look for no improvement in
his condition and he has been even worse in terms of pain this
year, requiring increased doses of narcotics for pain control."
No clinical or laboratory tests or other diagnostic information
accompanied this letter.

After Boardman was denied long term disability benefits from
the private carrier, Dr. Davis wrote a second letter on March 19,
2002, to "clarify [his] opinion as to the disability of
[Boardman]." Dr. Davis again stated his opinion that Boardman is
disabled and "unable to work with reasonable continuity in any
occupation." Dr. Davis stated that Boardman has "had a great
deal of treatment, including medications, a TENS unit, physical
therapy and narcotic medications" but only enjoys marginal
relief. Consequently, Boardman takes "a great deal of narcotic
medication to deal with his pain," according to Dr. Davis, which
causes "severe fatigue." Due to back pain and fatigue, Dr. Davis
opined that Boardman "simply is not able to maintain employment
in any capacity." He would not be able to work even in a
sedentary job, according to Dr. Davis, because he could miss more
than five days of work each month and require multiple breaks.

15 - OPINION AND ORDER

Boardman alleges the ALJ failed to provide legally sufficient reasons for rejecting Dr. Davis' opinion, though Boardman does not specify which standard he believes should have applied. The ALJ must provide clear and convincing reasons, supported by substantial evidence in the record, for rejecting the opinion of a claimant's physician when it is not contradicted by another doctor. See Morgan v. Commissioner of Social Security Administration, 169 F.3d 595, 600 (9th Cir. 1999). If a treating physician's opinion is contradicted by another doctor, the Commissioner may reject it by providing "specific and legitimate reasons" supported by substantial evidence in the record. Id. at 600-601. Further, a treating physician's opinion is given controlling weight only when his opinion is well supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantiated evidence" in the record. See 20 C.F.R. § 404.1527(d)(2).

Dr. Davis' opinion was contradicted by other treating and examining physician's opinions in the record, and so it was not entitled to controlling weight, but could be discredited by the ALJ for specific and legitimate reasons.

Contrary to Boardman's contention, the ALJ provided specific and legitimate reasons for discrediting Dr. Davis. The principal reason was that Dr. Davis' opinion was not supported by any record clinical or laboratory diagnostic evidence, and the

available medical evidence, discussed above, contradicted his
opinion.  The ALJ also relied on a residual functional capacity
assessment performed by Dr. McDonald on September 12, 2002.
Based on a review of the record medical and testimonial evidence
available at that time Dr. McDonald found Boardman capable of
light work limited only by the need to avoid exposure to
concentrated hazards.

    Boardman argues the ALJ's analysis of other physician's
opinions in the record cannot serve as a reason to discount Dr.
Davis because the ALJ did not state that he relied on them to
discount Dr. Davis.  I disagree.  This court reasonably infers
that in finding no objective medical evidence in support of Dr.
Davis' opinion the ALJ necessarily relied on his review of the
objective medical evidence in the record.  See Magallanes v.
Bowen, 881 F. 2d 747, 755 (9th Cir. 1989)(stating the court may
draw specific and legitimate inferences from the ALJ's decision).
Boardman's remaining arguments in contravention of this finding
similarly lack merit.

    The other main reason the ALJ rejected Dr. Davis' opinion
was that it took the form of an improper administrative finding
he was not qualified to make.  See 20 C.F.R. §§ 404.1527(d)(2).
A doctor's statement about a claimant's ability to work is not a
proper medical source opinion, but an administrative finding
reserved to the Commissioner.  SSR 96-5p.  Disability has both a

medical and vocational component.  <u>See</u> 20 C.F.R. § 416.960.
Because a medical source does not have the expertise to comment
on the vocational component of disability, a statement by a
medical source that a person is unable to work is not accorded
much weight.  <u>See</u> 20 C.F.R. § 416.927(e)(1).  The ALJ must
consider medical opinions about a claimant's condition and
functional limitations, along with all other evidence in the
record, to determine whether a claimant is disabled under the
Social Security Act.  SSR 96-5p.

     Boardman argues that even when a physician's states his
opinion that a claimant is unable to work, the ALJ cannot simply
disregard it.  I concur, and I find the ALJ did not disregard Dr.
Davis' opinion.

     Finally, this court infers that the ALJ also discredited Dr.
Davis' opinion, in part, because it was based on Boardman's
subjective complaints which the ALJ reasonably discredited, as
discussed above.  <u>See</u> <u>Magallanes</u>, 881 F. 2d at 755.

     In sum, I find the ALJ's reasons for rejecting Dr. Davis'
opinion were specific and legitimate, and supported by
substantial evidence.

18 - OPINION AND ORDER

**CONCLUSION**

Based on the foregoing, the Commissioner's decision is AFFIRMED, and this case is DISMISSED.

IT IS SO ORDERED.

DATED this _15 day of April, 2006.


                              /s/  Malcolm F. Marsh
                              Malcolm F. Marsh
                              United States District Court Judge